**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

            **Plaintiff,**

**v.**                                                          **No. 10-cv-20246-JPM-cgc**

**ANTHONY BEARDEN,**

            **Defendant.**

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS
STATEMENTS MADE DURING CUSTODIAL INTERROGATION**

      Before the Court is Defendant Anthony Bearden's Motion to Suppress Statements Made During Custodial Interrogation (D.E. #19). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation (D.E. #20). For the reasons set forth herein, the Court RECOMMENDS that Defendant's motion be DENIED.

**I. Proposed Findings of Fact**

      On February 16, 2010, Detective William Acred ("Detective Acred"), Detective Darryl Dotson ("Dotson"), Officer Brian Nemec ("Officer Nemec"), and a team of officers from the Memphis Police Department's Organized Crime Unit executed a search warrant of Bearden's residence at 2380 Warren in Memphis, Tennessee. (D.E. # 42, Oct. 16, 2010 H'rg. Tr. ("Tr.") at 6, 15, 36, 39). The officers knocked and announced their presence, waited for "several seconds to go by," and "pried the door open" to gain entry. (Tr. at 11-12).

      When officers originally entered the house, Detective Acred observed that Bearden's

1

demeanor was "calm" and "talkative." (Tr. at 16). The officers secured the residence, and Detectives Dotson and Acred brought Bearden into the kitchen to conduct an interview. (Tr. at 9, 16, 40). Detective Acred stated that they brought Bearden into the kitchen because his "girlfriend or wife and son were in the living room" and they did not "want to interview him in front of them." (Tr. at 17). Detective Acred stated that Bearden's statement began a "few minutes after" 10:36 a.m. (Tr. at 20). Detective Acred testified that Bearden remained "very calm," "very talkative," and "relaxed" during the interview, "didn't seem nervous at all," was "just sitting back," "wasn't really excited, in an excited state or anything," and was "fine the whole time." (Tr. at 16, 31, 34-35). Detective Doston also testified that Bearden was "calm and relaxed" from the time he came into contact with him, that he "didn't appear to be nervous or anything," and that his demeanor did not change during the interview. (Tr. at 39-40, 42).

Before the interview commenced, Bearden was required to sign two Rights Waiver Forms.[1] (Gov't. Resp. to Def.'s Mot. to Suppress ("Resp."), Exh. 1, 2). The Rights Waiver Forms informed Bearden that he was being questioned regarding the alleged offenses of possession of the controlled substance of crack cocaine with intent to manufacture, deliver, or sell and possession of a firearm during the commission of a dangerous felony. (Resp., Exh. 1, 2). The Rights Waiver Forms set forth in writing the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), as follows:

> You are going to be asked some questions regarding this investigation. You have the right to remain silent and anything you say may be used against you in a court of law. You have the right to have a lawyer present, either of your own choice, or court

---

[1] Detective Acred explained that two Rights Waiver Forms were completed in the instant case because two handguns were recovered in the execution of the search warrant. (Tr. at 30). The Rights Waiver Form further explains why two forms were completed, as it provides that the "COMPLETED FORM (ORIGINAL) IS TO BE TAGGED WITH THE SEIZED FIREARM . . . ." (Resp., Exh. 1, 2).

appointed if you are unable to afford one, and to talk with your lawyer before answering any questions, and to have your lawyer with you during questioning if you wish.

(Resp., Exh. 1, 2). In addition to the Rights Waiver Forms, Detective Acred read these warnings to Bearden and "explained . . . the charges he was looking at and informed him of his Miranda rights." (Tr. at 17, 21-22, 40-41). Bearden advised that he was "well aware" of his Miranda rights due to previous criminal charges in Illinois. (Tr. at 22, 41). The Rights Waiver Forms then asked, "Do you understand each of these rights I have explained to you?" and "Having these rights in mind do you wish to answer my questions at this time?" (Resp., Exh. 1, 2). On both Rights Waiver Forms, Bearden signed and circled the response "Yes" to both questions, initialed his responses, and signed the document. (Resp., Exh. 1, 2; Tr. at 22-23, 41-42). Once the Rights Waiver Forms were complete, Detectives Acred and Dotson began questioning Bearden regarding the items that were recovered inside his home. (Tr. at 23).

The First Rights Waiver Form pertained to the possession of a .38 Caliber Colt Special Texas Ranger Revolver. (Resp., Exh. 1). Bearden advised that the firearm was loaded with an unknown amount of ammunition when it was recovered, that "a guy named Will" owns the firearm, and that Will pawned[2] it to him on the previous night for "2 rocks." (Resp., Exh. 1). In addition to the information provided regarding the Colt revolver, Bearden answered several questions regarding the alleged offenses. Bearden stated that he was present at 2380 Warren when the police arrived. (Resp., Exh. 1.) Bearden advised that he lives at this address with Gwen Enge and Derrelle Enge and that he and his brothers own this "family house." (Resp., Exh. 1.) Bearden stated that the police

---

[2] The Court notes that the Rights Waiver Forms appear to erroneously state that the firearm was "pond" in exchange for the drugs (Resp., Exh. 1, 2); however, the Court believes the transcript of the evidentiary hearing correctly states that the firearms were "pawned" (Tr. at 25).

located "crack cocaine, 2 pistols, [a] scale, and a test tube" in his home, that the crack cocaine belongs to him, that he had been selling crack cocaine for two months, that he had "about 7 grams" of crack cocaine on that date, and that he sells "about a[n] ounce and a half maybe two" of crack cocaine per week. (Resp., Exh. 1). Bearden admitted that he had been previously convicted of domestic assault and home invasion in Illinois, that he had served six years of incarceration, and that he was under a court order restricting him from possessing a firearm. (Resp., Exh. 1; Tr. at 25-26).

The Second Rights Waiver Form pertained to the possession of a Ruger 9 Millimeter Pistol with a "scratched off" serial number. (Resp., Exh. 2). Bearden stated that he did not know if the firearm was loaded when it was recovered, that he "got it from a guy named Black" on the previous Friday, and that Black pawned[3] the firearm for two rocks of crack cocaine. (Resp., Exh. 2). In addition to the information provided regarding the Ruger pistol, Bearden answered several additional questions regarding the alleged offenses. (Resp., Exh. 2). With regard to the money he possessed when the search warrant was executed, Bearden stated that $500 came from two houses that he rents and $240 "came from crack." (Resp., Exh. 2). Bearden stated he was in possession of "probably a dime bag" or about "two grams" of marijuana. (Resp., Exh. 2). When asked if he sells marijuana, Bearden responded, "well, actually I give it away." (Resp., Exh. 2). Finally, Bearden restated that he was in possession of the two firearms located in the execution of the search warrant. (Resp., Exh. 2).

During the interview, Bearden was seated, was provided water and cigarettes upon his request, and was permitted to smoke. (Tr. at 31, 40). Bearden did not request a break at any time during his interview and did not complain of any health issues during the interview (Tr. at 31, 42).

---

[3] See, *supra*, n.2.

While Bearden did mention taking "heart medication or blood pressure or something like that," he did not claim or appear to be under the influence of "any type of narcotic or anything." (Tr. at 37). With respect to their firearms, Detectives Acred and Dotson remained armed during the interview, stating that they do so when they are on duty and executing a search warrant and did not remain armed with the intention of intimidating Bearden into giving a statement. (Tr. at 35, 45). With respect to the advice provided by the officers, Detective Acred testified that he never advised Bearden that he could potentially face federal charges because he does not have "any control over" the charges and does not "typically" discuss such issues. (Tr. at 32). Likewise, Detective Acred did not recall advising Bearden of the "gun program of the District Attorney along with the [United States] Attorney." (Tr. at 34). Detective Dotson did not advise Bearden of "any enhancement qualities" of those charges or that it was "another offense" to be a "felon in possession of a firearm." (Tr. at 44). Detective Dotson did advise Bearden in a "calm" manner that if they were unable to "determine or get some type of statement from anybody or whatever, determine who the ownership of the weapon and the drugs were," they would "have to arrest everybody." (Tr. at 43-44).

At the conclusion of the interview, Bearden was asked "Have you given these answers freely and voluntarily without any threats, coercion, or promises?" and "Have you been treated fairly?" (Resp., Exh. 1, 2). Bearden responded "Yes" to both questions. (Resp., Exh. 1, 2; Tr. 26-27, 31, 42). In conclusion, Bearden signed, dated, and listed the time of his signature on the Rights Waiver Forms. (Resp., Exh. 1, 2; Tr. 18, 27, 30-31). The interview was completed as to "both guns and the drugs" at 11:07 a.m.—approximately thirty minutes after the questioning began. (Resp., Exh. 1-2; Tr. at 20, 27, 30).

While Detectives Acred and Dotson interviewed Bearden, Officer Nemec was assigned to

take videotape of the scene. Officer Nemec testified that he began videotaping after law enforcement was able to gain entry into the residence and secure the house, which in this case began eleven minutes after the officers initiated the execution of the warrant. (Tr. at 9). Officer Nemec explained that he does not videotape the actual entry into the residence, but instead that the videotape was to "show the damages that we did to the door, if there's any damages," to "show the faces and the names of everybody that's in the residence at the time, where they were located," and to "run through each room to show the condition of the room before we start searching and also to show if there's any evidence laying out in plain view." (Tr. at 7, 12). Officer Nemec testified that, while he did have an opportunity to view Bearden, he was not present and did not videotape Detective Dotson and Detective Acred's interview of Bearden. (Tr. at 7, 9, 12). Officer Nemec stated, however, that Bearden's statement was taken after he began his videotaping. (Tr. at 10).

## II. Proposed Conclusions of Law

The sole issue presented in Defendant's Motion to Suppress is whether his statement was taken in violation of the Fifth Amendment to the United States Constitution, which prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966), an individual that is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id.; see also Duckworth v. Eagan, 492 U.S. 195, 201 (1989). While the four warnings of Miranda are "invariable," the Supreme Court has "not dictated the words in which the essential information must be conveyed." Florida v. Powell, 130 S.Ct. 1195, 1204 (2010) (quoting California v. Prysock, 453 U.S. 355, 359 (1981); Rhode Island v. Innis, 446 U.S. 291, 297 (1980)). Instead, reviewing courts are to inquire as to whether the warnings reasonably convey to a suspect his Miranda rights. Duckworth, 492 U.S. at 203.

A suspect may elect to waive his Miranda rights if the waiver is made "voluntarily, knowingly and intelligently." 384 U.S. at 444. The inquiry into whether a proper waiver was made has "two distinct dimensions." Moran v. Burbine, 475 U.S. 412, 421 (1986):

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). With respect to a knowing and intelligent waiver, the totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his Miranda rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." Murphy v. Ohio, 551 F.3d 485, 511 (6th Cir. 2009) (citing McCalvin v. Yukins, 444 F.3d 713, 719 (6th Cir. 2006)). The government bears the burden of demonstrating both that the Miranda warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights. 384 U.S. at 479.

   *A. Knowing and Intelligent Waiver*

As to whether Bearden waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it, the evidence demonstrates that Bearden was required to sign two Rights Waiver Forms before his questioning began. Both Rights Waiver Forms informed Bearden of the full scope of his Miranda rights, which Bearden initialed that he acknowledged but wished to waive. (Resp., Exh. 1, 2). In addition to the written Rights Waiver Forms, Detective Acred "explained . . .the charges he was looking at and informed him of his Miranda rights." (Tr. 17, 21-22, 40-41). Furthermore, Bearden indicated before he was advised of his Miranda rights that he was familiar with these warnings from a prior arrest. (Tr. 22, 41). All of these factors weigh heavily in favor of a finding that his statement was given knowingly and intelligently.

Despite the evidence that Bearden was advised of his Miranda rights, Bearden argues that he was not aware of the broader consequences of his waiver, including as follows: (1) that it was another offense to be a felon in possession of a firearm; (2) that he could be federally charged for his offenses; (3) that the information provided in his statements could be used to enhance his potential punishment; and, (4) that there is a "gun program of the Tennessee Attorney General." (Def.'s Post-Hearing Memorandum at 4-5; Tr. 32, 34, 44). Bearden does not provide any support for his arguments that Miranda requires officers to provide such extensive information. Further, contrary to Bearden's assertions, the Supreme Court has explicitly held that the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987); see also Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005). "Thus, when a suspect's voluntary decision to answer police officers' questions is made with the 'requisite' comprehension of all the information required

8

by Miranda, . . . his waiver is knowing and intentional under Miranda." Spring, 479 U.S. at 574-75.

In this case, the evidence demonstrates—and Bearden does not deny—that he was fully informed of his Miranda rights. The Fifth Amendment does not require further advice from law enforcement officers regarding the potential legal consequences of his abandonment of his rights. In fact, the Sixth Circuit has cautioned that law enforcement officers should not "cross[] the line" into "giving legal advice" because officers "run a high risk when they move into the realm of offering advice" regarding the potential offenses. Simpson v. Jackson, 615 F.3d 421, 438 (6th Cir. 2010). It is precisely for this reason that Miranda requires that a suspect be informed of his right to counsel so that, if the suspect so chooses, he can discuss the broader implications of his alleged offenses with his attorney. See id. Accordingly, the Court finds that Bearden made a knowing and intelligent waiver of his Fifth Amendment privilege against self-incrimination.

### B. Voluntary Waiver

As to whether Bearden voluntarily waived his Miranda rights, the evidence demonstrates that Bearden was fifty-one years of age with an eleventh grade education, that he acknowledged that he had "given these answers freely and voluntarily without any threats, coercion, or promises" and that he had been "treated fairly." (Resp., Exh. 1, 2). Detectives Acred and Dotson described the Defendant's demeanor while being questioned in the kitchen of his residence as "calm," "talkative," and "relaxed." (Tr. 16, 31, 39). Additionally, the Defendant asked for both cigarettes and water and was permitted both during his brief interrogation that lasted approximately thirty minutes. (Tr. 20, 27, 30-31, 40). All of theses factors weigh heavily in favor of a finding that Bearden's statement was given voluntarily.

Despite the evidence that Bearden voluntarily waived his rights, Bearden makes several arguments that the alleged waiver was involuntary because he was "not in a setting or condition where he could fully appreciate his constitutional rights." (Def.'s Mot. to Suppress at 2). First, Bearden states that he was interrogated "before he could gather his thought to comprehend what was going on around him" due to the "terrorist-like invasion of government agents" into his residence who remained armed with their weapons clearly visible during his questioning. (Def.'s Mot. to Suppress at 1; Tr. at 34-35). Next, Bearden argues that the officers threatened to arrest everyone in the home if they were unable to determine the ownership of the drugs and weapons. (Def.'s Post-Hearing Memorandum at 1-2, 4; Tr. at 43). Finally, Bearden asserts that he "suffers from a number of medical conditions for which medication is required." (Mot. to Suppress at 1).

Although Bearden makes these general allegations, he failed to provide any support for his arguments. With respect to whether the officers' forced entry or carrying of weapons would create a setting where Bearden could not appreciate his constitutional rights, the Sixth Circuit has held that questioning conducted even when a suspect may have been surprised by an arrest and may have been nervous during an official interrogation is not inherently coercive. See United States v. Calhoun, 49 F.3d 231, 235 (holding that the totality of the circumstances show that suspect's waiver of Miranda rights was voluntarily given when she was "polite and cordial after the initial shock of the arrest had passed"). As in Calhoun, while the officers in this case did make a forced entry and remained in possession of their weapons during the questioning of Bearden, the proof adduced at the hearing reflects that Bearden was "calm," "relaxed," and "talkative," that he was advised of his rights by Detective Acred and by the Rights Waiver Forms, that he was familiar with the Miranda rights from a previous arrest, that he acknowledged and understood his rights and wished to waive

10

them, that he had "given these answers freely and voluntarily without any threats, coercion, or promises" and that he had been "treated fairly." (Tr. 16-17, 21-23, 31, 40-42; Resp., Exh. 1, 2). Thus, the Court concludes that the fact that the officers made a forced entry and remained armed during their questioning does not render his statement involuntary.

With respect to whether Bearden's statement was involuntary based upon alleged threats and coercion, Bearden points to Detective Acred's testimony, in which he advised Bearden as follows: "What I told him is if we couldn't determine or get some type of statement from anybody or whatever, determine who the ownership of the weapon and drugs were, we would have to arrest everybody." (Tr. at 43). The Sixth Circuit has advised that, in considering the totality of the circumstances, the trial court must examine "both the characteristics of the accused and the details of the interrogation, and determine[] their psychological impact on an accused's ability to resist pressures to confess." United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991) (quoting United States v. Brown, 557 F.2d 541, 546 (6th Cir. 1977)). "To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity." Rigsby, 943 F.2d at 635 (quoting McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).

However, the Sixth Circuit has cautioned that "not all psychological tactics are unconstitutional." Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994). The Sixth Circuit has held that "there is nothing inherently wrong with efforts to create a favorable climate for a confession," and "mere emotionalism" will not "alone necessarily invalidate a confession." Ledbetter, 35 F.3d at 1069 (quoting Hawkins v. Lynaugh, 844 F.2d 1132, 1140 (5th Cir. 1988)).

Further, "maintaining that a statement is involuntary even after [Miranda] warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." Missouri v. Seibert, 542 U.S. 600, 609 (2004); see also Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.").

In this case, Detective Acred's comments that he would have to continue the investigation until it was complete—even if that required that they "arrest everybody"—may be characterized as an attempt to create a favorable climate for a confession. As in Ledbetter, there can be "little doubt but that the officers were hoping for a psychological advantage by their tactics." 35 F.3d at 1069. However, the Court must still consider the totality of the circumstances to determine if this statement resulted in overbearing Bearden's will.

As already discussed, Bearden was clearly advised of his Miranda rights and indicated that he wished to waive them. (Resp., Exh. 1-2). Bearden's interview was conducted in his own residence and lasted a mere thirty minutes, during which time he was provided water and cigarettes at his request. Bearden's interview cannot be characterized as either repeated or prolonged, and there are no allegations whatsoever of any physical threats, including deprivation of food or sleep. Thus, the Court finds that, considering the totality of the circumstances, the record does not reflect that Detective Acred's comments were sufficiently coercive to overbear Bearden's will and render his statement involuntary.

With respect to whether Bearden's statement was involuntary because Bearden "suffers from a number of medical conditions for which medication is required," the record contains neither any

evidence specifying any medical conditions he allegedly suffers from nor how his medical conditions or the medications utilized to treat them would affect his ability to voluntarily waive his Miranda rights. While Detective Acred recalls that Bearden did mention that he takes medication such as "maybe some type of heart medication or blood pressure or something like that," Detective Acred testified that he did not notice any indication that Bearden was "under the influence of any type of drug or narcotic" and "appeared to understand the questions" being asked of him. (Tr. at 37-38). Thus, the Court concludes that Bearden's allegations regarding his alleged medical conditions do not render his statement involuntary.

Accordingly, the Court RECOMMENDS that the District Court conclude that Bearden's Fifth Amendment privilege against self-incrimination was not violated because he was properly informed of his Miranda rights and elected to voluntarily, knowingly, and intelligently waived these rights.

### III. Conclusion

For the reasons stated herein, the Court RECOMMENDS that Bearden's Motion to Suppress be DENIED.

DATED this 15th day of February, 2011.

                                             s/ Charmiane G. Claxton
                                             CHARMIANE G. CLAXTON
                                             UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**